J-A32026-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.J.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1166 MDA 2017 |

Appeal from the Order Entered June 22, 2017
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
85400

BEFORE:   OTT, J., DUBOW, J., and STRASSBURGER*, J.

MEMORANDUM BY DUBOW, J.:                **FILED JANUARY 17, 2018**

Appellant, R.S. ("Father") appeals from the June 22, 2017 Order involuntarily terminating his parental rights to C.J.C. ("Child") pursuant to the Adoption Act, 23 Pa.C.S. §§ 2511(a) and (b).  After careful review, we affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

Father and D.S. ("Mother") began a relationship in the Summer of 2013.  Mother learned she was pregnant in July 2013.  Mother ended her relationship with Father approximately one month later when she caught him dealing drugs at his place of employment and learned that he had an extensive history of heroin and marijuana use.  Mother testified that Child was born in March 2014.  Father was not present at Child's birth and did not have contact with Child for the first three months of Child's life.

_____
*   Retired Senior Judge assigned to the Superior Court.

Father initiated a custody action and in June 2014, upon agreement of the parties, the orphans' court granted Father joint physical custody of 3-month-old Child and the parties agreed that Father would have physical custody 50 percent of the time. Father lived with his parents, Paternal Grandparents, during this time.

Mother and Father followed this custody arrangement for approximately 15 months, until December 2015, when Father relapsed, which resulted in his incarceration.

In February 2016, Paternal Grandparents filed a Petition to Intervene in the custody action. In March 2016, the orphans' court entered a Temporary Custody Order, which granted Mother primary physical custody of Child and granted Paternal Grandparents visitation with Child on alternating weekends. The court required Father to submit to weekly drug screens, and permitted Father to have supervised visits with Child at Paternal Grandparents home if his drug screens were negative. Although five of Father's drug screens were negative, the remainder of the screens were diluted or positive for opiates and marijuana.

On May 19, 2016, the orphans' court entered a Final Custody Order, which maintained the status quo concerning custody and visitation, and once again clarified that Father was not to have any physical contact with Child if Father tested positive for drugs. Two days later, Father testified positive for drugs.

In June 2016, Mother filed a Protection from Abuse ("PFA") Petition. The court granted a Temporary PFA Order against Father, prohibiting contact between Father and Child. After a hearing, the court dismissed the PFA Petition without prejudice and declined to enter a Final PFA Order because the current custody order already prohibited contact between Father and Child when Father was rendering positive drug screens.

On March 27, 2017, Mother filed a Petition for Involuntary Termination of Parental Rights ("TPR Petition") seeking to involuntarily terminate Father's parental rights under 23 Pa.C.S. §§ 2511(1), (2), and (b).

Father continually had positive drug screens until entering drug rehab for the eighth time in April 2017.[1] Father has only had physical contact with Child one time since May 2016, which was a court-ordered family counseling session that occurred at Father's current rehab facility.[2]

The orphans' court held a hearing on June 22, 2017, and heard testimony from Mother, Mother's husband L.S. ("Stepfather"), Father, Paternal Grandmother, and Paternal Grandfather.

Mother resides with Stepfather, Child, and Child's 18-month-old half-sibling. Mother testified that during the 15 months that Mother and Father shared physical custody of Child, Paternal Grandparents were the primary

---

[1] We note that Father entered this rehab facility after Mother filed the instant TPR Petition.

[2] We note that this visit occurred after Mother filed the instant TPR Petition.

caretaker for Child. During that time, Mother had concerns about Child being underfed, Child not receiving prescription medications, and Father smoking around Child when Child was visiting Paternal Grandparents' home.

Mother testified that while Child has been in her custody, Father has never attempted to speak with Child over the phone, Father has not sent any cards, letters, or gifts to Child, Father has not contacted Mother to ask about Child's health and well-being, and Father has missed at least four holiday visits with Child without notice or explanation. Mother testified that Child does not recognize Father in pictures, even though Child does recognize other individuals.

Mother also testified that Father was court-ordered to pay $107.00 per month in child support but Mother had only received two payments. She stated that the court had issued at least three bench warrants for Father's failure to pay child support and failure to appear at court for contempt proceedings and support conferences. Mother testified further that Father would often check himself into drug rehab instead of appearing in court and facing the consequences of his actions. When Father did appear in court, he was often late or high on drugs. *See* N.T., 7/22/17, at 10-15, 18-20, 23-42, 50-52, 55-56, 58.

Mother described the relationship between Child and Father by stating: "There is no relationship . . . I don't feel there is any bond." *Id.* at 26. Mother opined that Child's relationship with Father is not beneficial to Child, stating, "I don't feel that it benefits [Child] in any way due to the fact that

- 4 -

[Father] has put drugs, alcohol, and crime before [Child.] He does not watch out, again, for his wellbeing, safety, his health, his future." *Id.* at 27. Mother testified further that she has never seen Child express love towards Father, despite the fact that Child frequently expresses love to others. Mother stated that she wanted the court to terminate Father's parental rights because she, "strongly believe[s] that it is in the best – in the best interests of [her] son, his well[-]being, and his future." *Id.* at 30.

Stepfather testified that he has a very strong bond with Child and Child calls Stepfather "Dad." Stepfather has been involved in Child's life since before Child was born. Stepfather does not believe that a bond exists between Child and Father and explained, "[t]he little interaction that has been going on, hasn't seen him since last year of May, how can any infant have any relationship with anybody?" *Id.* at 65. Stepfather testified that he loves Child and intends to adopt Child if the court terminates Father's parental rights. Stepfather further testified that he does not believe that there would be a detrimental effect to Child if the court terminated Father's parental rights.

Father testified on his own behalf.[3] Father testified that he was currently residing in a long-term treatment facility for drug and alcohol rehabilitation, which he entered in April 2017. At the time of the hearing,

---

[3] Father's testimony can be found on pages 67-122 of the Notes of Testimony, 7/22/17.

Father had completed 70 days of the prescribed stay of 90 days. Father testified that after 90 days, he would move to transitional housing.

Father also testified that he was twenty-five years old and that he has had a drug problem since he was eighteen. Father stated that he primarily abuses heroin and marijuana but admitted that he has tested positive on numerous occasions for opiates, morphine, and oxycodone as well. Father has completed high school and one year of college.

Father testified that when he had shared custody of Child for 15 months, he was Child's primary caretaker, and stated that, "[t]he only time my parents would really help me is if I needed to take care of something else or work or whatever." *Id.* at 72. Father testified that Child was healthy and well cared for while in his care and that Child was always happy to see him, would give him hugs and kisses, and called him "Daddy."

Father admitted that his shared custody of Child ended because of his drug use and that the court had reduced his interaction with Child to supervised visits at Paternal Grandparents home every other weekend. Father further testified that after he failed several drug tests, the court prohibited Father from visiting with Child at Paternal Grandparents' house. Father stated that he continued to have contact with Child through phone calls and video chats when Child was staying with Paternal Grandparents on alternating weekends. However, Father did not ever contact Mother to speak with Child while Child was in Mother's physical custody. Father testified that he would call at least once, but often twice, on alternating

- 6 -

weekends when Child was visiting with Paternal Grandparents, and Child would show Father his toys and tell Father what he was doing.

Father acknowledged that the drug rehab facility only granted him one telephone call per week and he could not utilize video chat. Father also testified that he never contacted Child when he was actively using drugs. Nevertheless, Father maintains that he has had constant contact with Child except during the period that the Temporary PFA Order was in effect.

Father conceded that he did not pay child support consistently, but stated that he paid when he could. Father also admitted that the court continued more than one of his support contempt hearings because he had entered drug rehab directly before the hearings.

When asked if he has been able to maintain his sobriety, Father testified, "I've had periods of clean time. But overall success, no." *Id.* at 104. Father admitted that his history of being in and out of drug rehab does not provide stability for Child, but asserted that his current rehab facility is different, and more effective, than his treatment has been in the past. Nevertheless, Father admits that he has had limited success with rehab programs. Counsel inquired, "[y]ou can't guarantee that you won't end up back in rehab, can you?" *Id.* at 101. Father responded, "I guess not." *Id.*

With respect to Child's bond with him, Father testified that would borrow money or perform side jobs so he could regularly give Child gifts on Child's birthday and on Christmas. Father stated that he has a very strong bond with Child, and the bond is the same now as when he had shared

physical custody. Father asserted that terminating his parental rights would have a negative effect on Child because, "he wouldn't have a chance to know his real father." *Id.* at 85.

Paternal Grandmother testified that when Father had shared physical custody of Child, he was the primary caretaker. She also testified that since May 2016, Father had consistent contact with Child via telephone or video chat on alternating weekends when Child was visiting with Paternal Grandparents. Paternal Grandmother admitted there were periods where she did not know Father's whereabouts, but maintains that he always called Child consistently. Paternal Grandmother stated that Father would work for her to get money to buy Child toys. Both Paternal Grandparents testified that Father has a loving bond with Child and that Child recognizes Father as his parent. *See id.* at 122-153.

On June 22, 2017, the orphans' court granted Mother's TPR Petition and involuntarily terminated Father's parental rights. Father timely appealed. Both Father and the orphans' court complied with Pa.R.A.P. 1925.

**ISSUES ON APPEAL**

Father raises the following issues on appeal:

1. Did the [orphans' court] err in granting Mother's [TPR Petition] despite the only evidence being contested testimony and despite a showing by Father that a relationship existed and had been maintained with [Child]?

2. Did the [orphans' court] err failing to perform its mandatory analysis of whether there was a bond between [Child] and Father and the analysis of the impact of severing such a bond?

3. Did the [orphans' court] err in denying Father's request for a bonding evaluation in light of the contested testimony on the presence of a bond between [Child] and Father, after Father's presentation of evidence of a bond between [Child] and himself and his actions to maintain it?

Father's Brief at 2.

## LEGAL ANALYSIS

In his first two issues on appeal, Father avers that the orphans' court erred in granting Mother's TPR petition and involuntarily terminating Father's parental rights. *Id.* Father argues that, because there was conflicting testimony, Mother failed to meet her burden of presenting clear and convincing evidence that Father's parental rights should be involuntarily terminated. *Id.* at 9. Father also asserts that the orphans' court failed to properly analyze whether a bond existed between Father and Child, and the impact of severing that bond. *Id.* at 13-15.

When we review a trial court's decision to terminate parental rights, "we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation and quotation omitted). We may reverse a decision based on an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation and quotation omitted). We may not reverse, however, "merely because the record would support a different result." *Id.* (citation

omitted). We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation and quotation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation and quotation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation and quotation omitted). Provided that the court determines the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation and quotation omitted).

As stated above, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, *supra* at 276. We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (quotation and citation omitted). In addition, in order to affirm the termination of parental rights, this Court need only agree with any one subsection under Section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the instant case, we will analyze Section 2511(a)(1).

**Termination Pursuant to Section 2511(a)**

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of the TPR hearing is on the conduct of the parent and whether that conduct justifies a termination of parental rights. ***In re B.L.L.***, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, "the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." ***In re K.Z.S.***, 946 A.2d 753, 758 (Pa. Super. 2008) (citation and quotation omitted). Rather, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination."

*Id.* (citation and quotation omitted). Finally, a court "may not consider any effort by the parent to remedy the conditions described in subsections (a)(1), (a)(6) or (a)(8) if that remedy was initiated after the parent was given notice that the termination petition had been filed." ***In re D.W.***, 856 A.2d 1231, 1234 (Pa. Super. 2004). ***See*** 23 Pa.C.S. §2511(b).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and internal paragraph breaks omitted).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." ***Id.*** (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must

- 12 -

exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted). And most importantly, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* (citation omitted).

Our review of the record supports the orphans' court's determination that, because Father has refused or failed to perform parental duties for more than six months prior to the filing of the petition in order to preserve the parent-child relationship, Mother met her burden under 23 Pa.C.S. § 2511(a)(1). Father has neither cared for nor provided financial support for Child since Child was eighteen months old. The orphans' court opined:

> During Child's entire life, Father has not been able to hold a job, he has not had money to buy gifts or provide support for Child, and he has not properly cared for Child. Father has not been able to exercise custody rights because he had not been able to stay off drugs. Father is unable to provide a stable and secure environment for Child. . . . Father acknowledged that his being in and out of rehab has not been fair to Child and has not provided stability for him. Although Father seems to think things will be different in a few months, he does not have the right to wait for a more suitable time to be a parent. Child is three years of age. So far, Father has not been there for him and has not provided the essential parental care necessary for Child's physical or mental well-being, and the [c]ourt does not believe Father can remedy his failures in the foreseeable future.

Orphans' Ct. Op., dated 8/9/17, at 6.

Significantly, after relapsing and losing shared custody of Child, Father has had limited contact with Child, only via phone calls and video chats twice

- 13 -

a month. Because of his positive drug screens, Father has only physically seen Child one time since May 2016, at a court-ordered family therapy session in his current drug rehab facility.[4] Father has failed to contact Mother to inquire about Child's well-being and has failed to send Child gifts, letters, and cards while Child is in Mother's custody. While Father testified that he sent gifts to Child at Paternal Grandparents home, the orphans' court did not find that testimony to be credible. Instead, the orphans' court concluded "[Paternal Grandparents] are the ones who have provided care and gifts for Child when he has not been in the custody of Mother." Orphans' Ct. Op., dated 8/9/17, at 6.

While Father argues that contested testimony cannot meet the clear and convincing burden, he fails to cite any case law to support this. Contrary to his assertion, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, supra at 73-74 (citation and quotation omitted).

In light of the evidence, the orphans' court properly concluded that Father failed to perform his parental duties for more than six months

_____

[4] This visit occurred after Mother filed the TPR Petition and, consequently, the orphans' court is barred from considering this effort. *See In re D.W., supra* at 1234; 23 Pa.C.S. §2511(b).

preceding the filing of the TRP Petition. Accordingly, the orphans' court properly exercised its discretion in terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1).

**Termination Pursuant to Section 2511(b)**

We agree with the orphans' court's determination that the Mother met her burden under 23 Pa.C.S. § 2511(b), and that terminating Father's parental rights is in the best interest of Child.

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). This Court has emphasized that although a parent's emotional bond with her child is a "major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). Finally, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond

exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, ***supra*** at 762–63.

The orphans' court opined:

> Turning to the best interests of the Child, it is clear that termination of Father's parental rights is appropriate. . . . Mother said that she never saw Child express love for Father and that Child does not recognize him in photographs. Child does not ask about Father and does not talk about him after visits with Paternal Grandparents. Mother believes neither Child nor Father has shown much interest in the other, that there is no relationship between Father and Child, and that no bond exists. Father has been and is unable to meet the Child's developmental and emotional needs. On the other hand, Child recognizes [Stepfather] as his daddy and gets fatherly support from him.
>
> Father and [Mother] naturally disagree that Child is not bonded to Father and that Child does not remember him. Child's counsel was of the opinion that there was no significant relationship between Child and Father. . . . Counsel was of the opinion that there would be no lasting negative effect on Child if Father's parental rights were terminated. The Court agreed with Counsel, finding that throughout the hearing Mother's testimony was more credible than that presented by Father and [Paternal Grandmother].

Orphans' Ct. Op., dated 8/9/17, at 7-8. Our review of the record supports the orphans' court's conclusions.

Father argues that the orphans' court erred when it failed to consider and analyze Father's testimony regarding the bond that exists between Father and Child. On the contrary, the orphans' court did consider Father's testimony, but did not find that testimony to be credible. It is the orphans' court role to make all credibility determinations and resolve conflicts in the

evidence. ***In re M.G.***, ***supra*** at 73-74. The orphans' court's failure to analyze testimony that it deemed not credible does not constitute error.

**Bonding Evaluation**

In his last issue, Father avers that the orphans' court erred in denying his request for a bonding evaluation in light of conflicting testimony on the presence of a bond between Child and Father. ***See*** Father's Brief at 2. He asserts that a bonding evaluation was particularly appropriate in light of Father and Paternal Grandmother's testimony regarding the existence of a bond between Father and Child. ***See id.*** This issue lacks merit.

This Court has concluded, "[i]n analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." ***In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa. Super. 2008). Moreover, as stated above, in cases where there is no evidence of a bond, it is reasonable for a court to infer that no bond exists. ***In re K.Z.S.***, ***supra*** at 762-63. "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***Id.*** at 763.

Instantly, Father has had extremely limited telephone and video chat contact with child twice a month since May 2016. While Father and Paternal Grandmother testified that a bond existed between Father and Child, the orphans' court did not find this testimony to be credible. In light of the limited contact between Father and Child, it was reasonable for the court to

infer that no bond exists and the court was not required to order a formal bonding evaluation. Accordingly, we find no error.

Moreover, we agree with the orphans' court that it was disingenuous for Father's counsel to request a bonding evaluation at the conclusion of the TPR hearing. The orphans' court opined, "[t]he [c]ourt viewed the request as nothing more than a delay tactic, contrary to Child's right to fulfillment of his potential in a permanent, healthy, safe environment with proper parenting." Orphans' Ct. Op., dated 8/9/17, at 8. We agree.

**CONCLUSION**

In sum, our review of the record reveals that Mother provided clear and convincing evidence to support the termination of Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1) and (b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/17/2018